**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>Robert Salazar Quintero,<br><br>    Defendant. | No. CR-09-1356-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Defendant Robert Salazar Quintero's Motion to Suppress Statements/Motion to Suppress Evidence (Dkt. # 22). In the Motion, Quintero seeks to suppress three different categories of evidence.

He seeks to suppress: first, evidence seized during the search of his bedroom on September 17, 2008; second, statements made at the GRIC Police Department on September 17, 2008; third, statements made during and after the September 18, 2008 polygraph that also occurred at the Gila Indian River Police Headquarters. For the reasons set forth below, the Motion to Suppress Statements and Evidence is denied.

**FACTS**

On July 2, 2010, the Court held an Evidentiary Hearing at which three witnesses testified. Defendant waived the right to call Detective Kimberly Dodd. Based on the evidentiary hearing, the Court finds as follows.

Defendant was visited at his home on September 17, 2008 by Special Agent Greg

Catey, Detective Jeffrey Hunter and Detective Kimberly Dodd. They indicated both to Defendant and to his mother, Kathleen Daniel, that they were there to investigate allegations that Defendant had molested two child victims. During the course of that interview, Defendant gave his consent to search his bedroom. At the evidentiary hearing the Government introduced without objection Exhibit 17 which is a consent to search form. It bears Defendant's signature. The form indicates that the Defendant has been advised that he could refuse to consent and require that a search warrant be obtained prior to a search, that if he did consent and evidence was found as a result of the search it could be used against him, that he had the right to consult an attorney before or during the search, and that he could withdraw his consent to search at any time prior to the search's conclusion. The Defendant by his signature indicates that he knowingly, intelligently and voluntarily waived any rights and that he consented to the search. His mother also signed the form. During the search of Defendant's bedroom, the police located adult pornography.

Defendant subsequently accompanied Special Agent Catey to the police department where Agent Catey gave Defendant his Miranda warnings. Exhibit 18, the Miranda consent form, was admitted without objection. The form was signed by Defendant. Agent Catey testified that he reviewed with Defendant each one of the rights set forth in Exhibit 18 and that after he reviewed each of the rights Defendant indicated he understood his rights and that he would answer any questions that Agent Catey had. Defendant then signed and dated the form.

Attachment B to the Government's Response, Bates pp. 431-32, establishes that Agent Catey did review each of the Miranda rights with Defendant. Defendant indicated that he understood them and that he was willing to talk to the police officers. After speaking with the Special Agent and the Detective for about thirty-five minutes the Defendant states:

R. QUINTERO: Can we get done with the questions now, I mean –

AGENT CATEY: What's that?

R. QUINTERO: What? The questions? The papers say stop or whatever. Stop talking or whatever.

| | |
|---|---|
| 1 | AGENT CATEY: Okay. |
| 2 | R. QUINTERO: And I want to talk to my PO and maybe a lawyer now. So – |
| 3 | AGENT CATEY: Okay. |
| 4 | R. QUINTERO: Yeah. |
| 5 | AGENT CATEY: Okay. Any other questions for us or anything? |
| 6 | R. QUINTERO: No. |

The Special Agent and the Detective then ascertained the identity of Defendant's parole officer and left the room. Two minutes later, Agent Catey returned and he indicated to Defendant that he should indeed contact his parole officer in light of the fact that he had had contact with law enforcement. Agent Catey then inquired as to whether or not it was Defendant's wish to speak with an attorney.

AGENT CATEY: Ok. So – And the other thing is you mentioned that something about an attorney.

R. QUINTERO: Yeah, I kind of wanted to see what you were talking about, and see if maybe talk to one, see what this whole load or something like that. Like it's way big or something.

AGENT CATEY: What do you mean?

R. QUINTERO: What you were talking about.

AGENT CATEY: You mean that whole load following you around, you don't want (indiscernible)

R. QUINTERO: Or whatever. I was kind of wondering, like, what does that mean?

AGENT CATEY: Well, I can –

R. QUINTERO: I was kind of wondering –

AGENT CATEY: – explain.

R. QUINTERO: – what kind of stuff she gave.

AGENT CATEY: Let me tell you something. I mean, if you want to talk to your attorney and you're telling me right now – let me finish, okay?

R. QUINTERO: Uh-huh.

AGENT CATEY: If you're telling me that you want to talk to your attorney and you don't want to talk to me, that's one thing. But if you got questions of me that I can answer, like you said, what is this big thing right there?

| | |
|---|---|
| 1 | R. QUINTERO: Uh-hun |
| 2 | AGENT CATEY: I'm willing to talk to you. But you got to tell me if that's – |
| 3 | R. QUINTERO: (Indiscernible) answer that phone? |
| 4 | AGENT CATEY: Yeah. Do you want to talk to me then in regards to that or – |
| 5 | |
| 6 | R. QUINTERO: Just about that, yeah. (indiscernible) |
| 7 | AGENT CATEY: Okay. You're talking like the big load? What are you – |
| 8 | R. QUINTERO: Yeah. |
| 9 | AGENT CATEY: Ask that question again. |
| 10 | R. QUINTERO: Well, you said something about the big load and on my back, something like that, you said I'll be carrying it around for a long time (indiscernible). |
| 11 | |
| 12 | AGENT CATEY: What I'm trying to indicate to you is that sometimes we get this feeling of shame. Okay? Feeling of embarrassment – |
| 13 | |
| 14 | R. QUINTERO: Oh. You're not talking about – |
| 15 | AGENT CATEY: Yeah. I mean. I'm not. That's what I mean, is you get this overwhelming feeling of shame and embarrassment about something you've done in your past. We've all been there. I mean none of us are goody two-shoes. Okay. |
| 16 | |
| 17 | R. QUINTERO: Uh-huh. |
| 18 | AGENT CATEY: That's what I'm talking about. Right? I mean – |
| 19 | The two then continued to talk about possible ranges of sentences or punishment for |
| 20 | the crimes at issue and then Defendant raised the possibility of taking a lie detector test. |
| 21 | They then talked about further contact with the parole officer and then Agent Catey said |
| 22 | AGENT CATEY: Okay. So what do you want me to do now? I'm in a weird predicament. You know what I mean? |
| 23 | |
| 24 | R. QUINTERO: Yeah. |
| 25 | AGENT CATEY: I don't know if you want to talk to me. I don't know if you don't. I'm in a situation where I'm not sure to what degree – |
| 26 | R. QUINTERO: Uh-huh. |
| 27 | AGENT CATEY: You know, we – you know, to what degree of a situation we're in – |
| 28 | |

- 4 -

| | |
|---|---|
| 1 | R. QUINTERO: Yeah. |
| 2 | AGENT CATEY: You know, is it just what I know of at this point – |
| 3 | R. QUINTERO: I don't know what your talking about kind of stuff – |
| 4 | AGENT CATEY: a pedophile. |
| 5 | R. QUINTERO: Yeah. |
| 6 | AGENT CATEY: You're not a pedophile. |
| 7 | R. QUINTERO: (Indiscernible) still don't know (indiscernible). |

p. 471.   Then Defendant subsequently asks

    R. QUINTERO: Are we going to talk again later or what?

    AGENT CATEY: I – that's what I asked you.  I mean, I'll ask you again.  What do you want –

    R. QUINTERO: I don't want to say anything.  I want to go home.

    AGENT CATEY: I don't know I'll have to ask (indiscernible)

    R. QUINTERO: (Indiscernible)

    AGENT CATEY: Because I mean that – there's also concerns that I have that a little bit of – if Samantha and whomever else have made statements –

    R. QUINTERO: Uh-huh.

    AGENT CATEY: You know.  I need to make – you know, I've got to be able to say that this guy has been truthful and he's not a concern.  You know what I mean?

    R. QUINTERO: Uh-huh.

    AGENT CATEY: And so you understand the predicament I'm in.

    R. QUINTERO: Yeah.

Defendant finally asks on p. 477

    R. QUINTERO: So, we're not done talking about it?  Are we going to be talking tomorrow or something?

    AGENT CATEY: You?  You want me to come back here?

    R. QUINTERO: Yeah.

    AGENT CATEY: Okay.

    . . .

> AGENT CATEY: So. I'll be back in and – do you want to talk further, or what are you saying?
>
> R. QUINTERO: Well, if you can actually (indiscernible).
>
> AGENT CATEY: All right. Then we'll talk. Okay?
>
> R. QUINTERO: Yeah.

Agent Catey then leaves the room and comes back in six minutes later.

> AGENT CATEY: Okay. I had on opportunity to talk to him. Let me make sure. You want to talk?
>
> R. QUINTERO: (Indiscernible).
>
> AGENT CATEY: Okay. I had on opportunity to talk to him. They're trying to determine the level of help that you would need.
>
> R. QUINTERO: Uh-huh.
>
> AGENT CATEY: Okay? And they're still trying to figure that out. Okay? And I told them what we had talked about and they have a lot of questions for you.
>
> R. QUINTERO: Uh-huh.

Defendant thereafter described additional occurrences between himself and the victims. Defendant apparently was arrested and spent the night in the Gila River Indian jail facility. The next day he was transported from the facility to the interrogation room to have a pre-polygraph, polygraph and post-polygraph interview with Agent Fuller. Agent Fuller testified that he gave Defendant the examination, and that he read Defendant his Miranda rights and had him sign the form indicating that he waived those rights prior to any examination. The form was admitted without objection as Exhibit 19. It sets forth all of Defendant's Miranda rights and bears his signature. Agent Fuller testified that Defendant asked him no questions about his rights when he read him the form. Agent Fuller then reviewed with Defendant the consent to polygraph form which was admitted without objection as Exhibit 20. In the pre-polygraph interview they discussed the admissions made by Defendant on the previous day and then after the polygraph was taken and Defendant had given some "hard" responses during the polygraph they discussed additional acts that took place between Defendant and the alleged victims.

Defendant testified at the suppression hearing and said he remembered on the morning before the polygraph asking somebody "am I going to see my lawyer." He says they told him they would get his parole officer or his lawyer. He testified that Agent Fuller was there when this interchange occurred. He said he told someone that he wanted to see a lawyer before he did anything or signed anything and he was told that lawyers were not allowed.

On cross-examination, Defendant admitted that he had signed Exhibit 18 and that he had signed Exhibit 19. Both forms indicate that Defendant has a right to have a lawyer present during questioning. Defendant, however, acknowledges he signed the form but stated that he didn't read it. The form, he testified, was on a computer screen and was blurry and he doesn't remember whether it was read to him. He further acknowledges that he signed Exhibit 20. Again, he signed the box on the computer screen but didn't read the form. He doesn't remember whether Agent Fuller read him that form. He acknowledges that he never said after the polygraph was over that he didn't want to answer any further questions.

Detective Hunter testified at hearing, he said he transported the Defendant with then Detective Dodd to the polygraph exam room on the morning of the 19th. Defendant made no statements about an attorney and he doesn't remember having any discussion with Defendant. He testified that the distance between the jail cell and the polygraph examination room is no more than twenty-five yards and the walk took less than a minute.

## ANALYSIS

**I.      Motion to Suppress Pornography Found in the Bedroom**.

Defendant moves to suppress the pornography found in his bedroom. He argues in his motion to suppress that warrantless searches are presumptively invalid citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022 (1971). When the Government seeks to justify a warrantless search, the burden is squarely on the Government to show the search comes within an exception and was reasonable. *Stoner v. California*, 376 U.S. 438, 84 S. Ct. 889 (1964). The Government, nevertheless, has established the reasonableness of the search and that it accomplished the search pursuant to an exception to the warrant requirement. It has established that it received the consent of both Defendant and his mother, the owner of

the home, to accomplish the search in Defendant's bedroom. *United States v. Drayton*, 536 U.S. 194, 207 (2002) ("Police officers act in full accordance with the law when they ask citizens for consent . . . When this exchange takes place it dispels inferences of coercion."). The government has established to the satisfaction of the Court that Defendant's consent was voluntarily.

**II.  Defendant's Motion to Suppress Confessions Made on September 17, 2008.**

Defendant next moves to suppress the confessions made in the interview on September 17, 2008 due to the *Wong Sun* doctrine. *United States v. Wong Sun*, 371 U.S. 471 (1963). Nevertheless, for the reasons specified above, Defendant has not established that his confession flowed from a Fourth Amendment violation. Therefore, the *Wong Sun* doctrine does not apply. Defendant further moves to suppress his statements of both the 17th and 18th because his Miranda waiver was not knowingly and intelligently given. The Court has reviewed the interrogation that was conducted on the 17th and the transcript provided for the 18th. Miranda rights were reviewed with him and Defendant further acknowledged at hearing that he signed the Miranda waiver forms. Both Agents Catey and Fuller testified that they read the forms to Defendant. The Court finds upon its review of the interrogatories that Defendant was both competent to understand his Miranda rights, that he was read them, that he knowingly, intelligently and voluntarily waived them.

Finally, Defendant argues that he clearly invoked his right to remain silent and his desire to speak with an attorney. After a careful review of all of the transcripts of the conference on the 17th, the Court finds that at best Defendant's statements with respect t his right to remain silent and/or speak with an attorney were ambiguous. "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' . . . the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. United States*, 560 U.S. ___, ___ (2010) quoting *Davis v. United States*, 512 U.S. 452, 461-62 (1994). Further, the *Berghuis* Court noted "there is no principled reason for adopting different standards for determining when an accused has invoked the *Miranda* right to remain silent, and the *Miranda* right to

- 8 -

counsel." *Id.*

In this case, Defendant made ambiguous statements about whether he wished to invoke his *Miranda* rights. On each occasion, Defendant indicated a willingness to continue to speak with the agent at least on limited matters. Defendant continued to speak with him and never in the Court's view clearly invoked his right to remain silent or his right to speak to an attorney. *See, e.g., Clark v. Murphy*, 331 F.3d 1062, 1071 (9th Cir. 2003); *United States v. Thierman*, 678 F.2d 1331 (9th Cir. 1982); *United States v. Rodriguez*-Gustellum, 569 F.2d 482, 468-88 (9th Cir. 1978).

Defendant never affirmatively stated that he wanted an attorney present during questioning. He claims that he did so prior to the interview of September 18, 2008. Nevertheless, the balance of the evidence demonstrates to the Court that he did not. He signed Agent Fuller's form indicating that he understood that he had the right to have an attorney present during questioning and that he could cease answering questions at any time. He claims that he asked for the presence of an attorney and was told that he couldn't have one. Nevertheless, both Agents Fuller and Detective Hunter's testimony was to the contrary. The Court finds that testimony more reliable.

## CONCLUSION

For the above reasons Defendant's Motion to Suppress Statements/Motion to Suppress Evidence is denied, Doc. 22.

DATED this 12th day of July, 2010.

*H. Murray Snow*
G. Murray Snow
United States District Judge